**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| GEISHA, LLC, d/b/a JAPONAIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05 C 5529 |
| | ) | |
| ROY TUCCILLO, an individual, | ) | Judge Rebecca R. Pallmeyer |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Geisha LLC ("Geisha") owns and operates the restaurant "Japonais" in Chicago, Illinois. Geisha has utilized a stylized rendering of the name "Japonais" in connection with the restaurant since its opening in September 2003, and asserts that it has thus acquired trademark rights in that design. In June 2004, Defendant Roy Tuccillo ("Tuccillo"), a New York resident who runs a frozen seafood company, filed a federal trademark application for a virtually identical design. Tucillo has further expressed his intent to use the mark in connection with a restaurant he plans to open in the New York area. Upon learning of Tuccillo's application in September 2005, Geisha filed a ten-count complaint, alleging trademark infringement under 15 U.S.C. § 1125(a) and asserting common law claims including conversion and unfair competition. Count II of the complaint seeks a declaratory judgment that Tuccillo's intended use of the mark would constitute trademark infringement. Geisha now moves for summary judgment on that count only. For the reasons set forth below, Geisha's motion is denied for lack of jurisdiction.

## BACKGROUND[1]

### A.    Geisha and Japonais

---

[1]    Facts presented here are drawn from the parties' Local Rule 56.1 statements and attachments. Geisha's Updated Local Rule 56.1(a)(3) Statement of Material Facts is cited here as "Pl.'s 56.1." Roy Tuccillo's Response to Geisha's Updated Local Rule 56.1(a)(3) Statement of Material Facts and Roy Tuccillo's Statement of Material Facts Pursuant to Local Rule 56.1(b)(3) Supporting a Denial of Geisha's Motion are both cited as "Def.'s 56.1."

Geisha, a Delaware limited liability company, was formed in December 2001 for the purpose of opening a Chicago restaurant and lounge under the name "Japonais."[2]  (Pl.'s 56.1 ¶¶ 1, 9.)  The restaurant, which opened in September 2003 in Chicago's River North neighborhood, offers a fusion of modern Japanese and European cuisine.  (*Id.* ¶¶ 9, 11.)  Geisha does business as "Japonais" and has registered that name with the State of Illinois, and further owns all intellectual property associated with the Japonais restaurant.  (*Id.* ¶ 1.)

In early 2003, Geisha hired an advertising and marketing firm, Vertis, Inc. ("Vertis"), to create a unique design for Japonais.  (*Id.* ¶ 10.)  Vertis subsequently created a design using unique lettering and font ("the Japonais design").[3]  (*Id.*)  Geisha did not file a trademark registration application for this design with the U.S. Patent and Trademark Office ("PTO").  From the time Japonais opened its doors to the public on September 23, 2003, however, the restaurant has displayed the Japonais design above its entrance and on its website, www.japonaischicago.com.  (*Id.* ¶¶ 11-13.)  Geisha further points to advertisements for the restaurant that appeared in September and November 2003 in two magazines, *Front Desk* and *Chicago Social*, which have monthly circulations of roughly 50,000 and 75,000 respectively.  (*Id.* ¶ 14.)  These advertisements

---

[2]     Rick Wahlstedt is a managing member of Geisha.  (Wahlstedt Second Supp. Aff. ¶ 1.)  The record before the court does not reveal the names of the other members of the limited liability company, nor any of the members' citizenship.

[3]     The following image of the Japonais design appears in Geisha's briefs (without the vertical line on the left side, which the court has been unable to delete):



Tuccillo purports to deny that the Japonais design was created with unique lettering or font.  He cites a now-cancelled trademark registration, filed in 1993 for a retail store called "Japonaji," that he asserts utilizes the same font as Vertis' creation.  (Def.'s 56.1 ¶ 10 (citing Trademark Registration No. 1,905,174).)  Tuccillo submitted no materials portraying the Japonaji mark.  In any event, from viewing the image of that mark that appears on the PTO's website, the court is uncertain whether the Japonaji mark indeed utilizes the same font as the Japonais design.  *See* TARR Status for Registration No. 1,905,174, http://www.uspto.gov/main/trademarks.htm (search performed).

prominently feature the Japonais design. (Ex. 4 to Pl.'s 56.1, at Exs. A, B, & E.)

Since its opening, Japonais has received a good deal of favorable press coverage in local and national newspapers and magazines. (Pl.'s 56.1 ¶ 11.) The *Chicago Tribune* and the *Chicago Sun-Times* reviewed the restaurant in October 2003, and lengthy articles about Japonais appeared in December 2003 in *CS* magazine, which has a monthly circulation of roughly 75,000, and *Nation's Restaurant News*, which has a monthly circulation of roughly 80,000. (Ex. 4 to Pl.'s 56.1, at Exs. C, D, G, & H.) Japonais also received brief mention in the January 2004 issue of *Bon Appetit*, which has a monthly circulation of roughly 1,300,000. (*Id.* at Ex. I.) In May 2004, *Chicago* magazine (monthly circulation approximately 185,000) named Japonais one of Chicago's "Best New Restaurants," and *Conde Nast Traveler* magazine (national monthly circulation of approximately 775,000) featured Japonais in a "Hot Tables" survey of 66 new restaurants worldwide. (*Id.* at Exs. J & K.) The June 14, 2004 issue of *Time* mentioned a dessert available at Japonais, and an extensive article about Japonais appeared in the June 2005 issue of *Culinary Trends* magazine. (*Id.* at Exs. O & R.) Brief mentions also appeared in 2005 in well-known magazines such as *Travel & Leisure*, *Us Weekly*, *People*, and *Food & Wine*, (*id.* at Exs. S, U, V, & Y), and a September 25, 2005 article in the *New York Times* referred to Japonais as an example of one of Chicago's "excellent fusion joints." (*Id.* at Ex. Z.) Significantly, however, the Japonais design appears in only one of the articles Geisha cites: a feature on the actress Jennifer Aniston, published in the August 29, 2005 issue of *People*, that displays a picture of the restaurant's entrance accompanied by a caption explaining that Ms. Aniston had been spotted there. (*Id.* at Ex. X.) *People* has a weekly circulation of roughly 3,600,000. (Wahlstedt Aff. ¶ 6, Ex. 4 to Pl's 56.1.)

Following the success of the Chicago restaurant, Geisha made plans to open Japonais restaurants in New York and Las Vegas. (Pl.'s 56.1 ¶¶ 16-17.) Geisha executed a lease in March 2005 for property in New York's Flatiron District, and the New York Japonais restaurant opened on July 19, 2006. (*Id.* ¶ 16.) The Japonais design is prominently displayed throughout the restaurant,

3

including on the menus and on the entrance awning, and on the restaurant's website, www.japonaisnewyork.com.[4] (*Id.*) The New York Japonais has received significant publicity in newspapers and magazines, including the *New York Times*, the *New York Post*, and *New York* magazine. (*Id.*; Ex. A to Wahlstedt Second Supp. Aff.) As of the time the parties completed their summary judgment filings, a Las Vegas Japonais was under construction at the Mirage Hotel and Casino, and was scheduled to open on September 1, 2006.[5] (Pl.'s 56.1 ¶ 17.)

**B.    Tuccillo's Registration of the Japonais Design**

Defendant Tuccillo resides in New York state and operates Anchor Frozen Foods, a supplier of frozen seafood products. (Pl.'s 56.1 ¶ 2.) On June 25, 2004—nine months after the opening of the Chicago Japonais, and nine months before Geisha obtained a lease for its New York restaurant—Tuccillo filed an intent-to-use trademark registration application with the PTO[6] (the "ITU

---

[4]    Tuccillo claims to lack "information to respond" to Geisha's assertion, but admits "for purposes of this motion only" that the New York Japonais opened in July 2006. (Def.'s 56.1 ¶ 16.) As Geisha's assertions regarding the display of the Japonais design are supported by its citation to the affidavit of Rick Wahlstedt, a managing member of Geisha, (Wahlstedt Second Supp. Aff. ¶¶ 1, 3-4), and as Tuccillo fails to challenge these assertions with any specific reference to the record, the court deems those assertions admitted. *See* N.D. Ill. R. 56.1(b)(3)(B-C).

[5]    The Las Vegas Japonais has since opened. *See* http://www.japonaislasvegas.com. The website's design is identical to those of the New York and Chicago restaurants, and prominently displays the Japonais design. *Id.*

[6]    Under the Lanham Act, a person who has a bona fide, good faith intention of using a trademark in commerce may apply for registration of that trademark by filing an intent-to-use application with the PTO. *See* 15 U.S.C. § 1051(b)(1); 37 C.F.R. § 2.34(b). The PTO examines the sufficiency of the application and publishes the mark for opposition; if there is no opposition, the applicant will receive a notice of allowance. *See* 15 U.S.C. § 1063(a) & (b)(2). The trademark will not be registered, however, until the applicant further files a verified statement that the mark is being used in commerce—a Statement of Use. 15 U.S.C. § 1051(d); *see* 37 C.F.R. § 2.88. The Statement of Use must be filed within six months after issuance of a notice of allowance. 37 C.F.R. § 2.88(a). An applicant may request a six-month extension during that time; the request must include a verified statement that the applicant "still has a bona fide intention to use the mark in commerce." 37 C.F.R. § 2.89(a)(3). Successive extensions are available upon a showing of "good cause," which requires "a statement of the applicant's ongoing efforts to make use of the mark in commerce on or in connection with each of the relevant goods or services." 37 C.F.R. § 2.89(d). The time requested may not extend beyond 36 months from the issuance of the notice of allowance, and the applicant may not request any further extensions after that time. *See* 37 C.F.R.

4

Application") for a stylized rendering of the word "Japonais." (*Id.* ¶ 18; Application for Service Mark Registration, Serial No. 76599761, Ex. 1 to Pl.'s 56.1.) It is undisputed that this mark is "virtually identical" to the Japonais design. (Def.'s 56.1 ¶ 19.) The ITU Application states that Tuccillo has "a bona fide intention to use the mark" in connection with "restaurant and lounge services." (ITU Application, at 1.) The PTO issued a Notice of Allowance to Tuccillo on August 23, 2005. TARR Status for Serial No. 76599761, http://www.uspto.gov/main/trademarks.htm (search performed).

Tuccillo's motivation for filing the ITU Application is unclear. The court notes that in an answer to one of Geisha's interrogatories, Tuccillo stated that he had used the name "Japonais" in connection with his seafood business since early 2000, including using the name as a sign in the window of his "store,"[7] and that in late 2000 he hired a company to hang a sign in the store that included a stylized rendering of the word. (Answer to Interrogatory No. 2, Ex. 2 to Pl.'s 56.1.) He further stated that he "decided" to open a Japanese restaurant named "Japonais" in 2002, and that in June 2002 he had purchased an existing Chinese restaurant in Baldwin, New York,[8] with the intent of converting it; instead, however, he decided in the summer of 2003 to lease that space to a Dunkin' Donuts and a Quizno's. (*Id.*; Tuccillo Dep., Ex. 3 to Pl.'s 56.1, at 63.) He then began to look for another location for his planned Japonais restaurant, (Answer to Interrogatory No. 2); his efforts in that regard are described below. According to Tuccillo, he filed the ITU Application in June 2004 "to protect the name and design." (*Id.*)

Geisha asserts that it was unaware of Tuccillo's ITU Application until September 2005—after the PTO issued its Notice of Allowance to Tuccillo, and after the time period to oppose

§ 2.89(e)(1).

[7]     Tuccillo provides no other information about his "store"; the court notes that a website for Anchor Frozen Foods lists no physical address, only a post office box in Westbury, New York. *See* http://www.anchorfrozenfoods.com/.

[8]     Baldwin is on Long Island, approximately 30 miles east of Manhattan. *See* Google Maps, http://maps.google.com/maps.

the application had expired.  (Long Aff. ¶ 2, Ex. 5 to Pl.'s 56.1.)  On September 9, 2005, Geisha's attorney, Joan Long, sent a letter to Tuccillo's trademark attorney, Stewart Bellus, asserting that Geisha had established trademark rights to the Japonais design through actual use of that design; Long enclosed clippings of press coverage of the Chicago Japonais restaurant with the letter, which Long asserted demonstrated that the restaurant had received "nationwide publicity."  (Letter from Long to Bellus of September 9, 2005, Pl.'s Ex. 5, at Ex. A.)  Long asked, *inter alia*, that Tuccillo file a "voluntary abandonment" of his application with the PTO.  (*Id.*)  Bellus responded on September 14, 2005, denying that Long's enclosures demonstrated Geisha's first use of the Japonais design at all, nor any reputation outside of Chicago.  (Letter from Bellus to Long of September 14, 2005, Pl.'s Ex. 5, at Ex. B.)  Bellus further stated that because the PTO had "approved" Tuccillo's application, "a registration ultimately will issue and my client will have nationwide rights in <u>all</u> areas of the United States other than those in which [Geisha] can establish rights that predate [Tuccillo's] filing date."  (*Id.* (emphasis in original); Pl.'s 56.1 ¶ 21.)  Geisha responded by filing the present action on September 26, 2005.

## C.     Tuccillo's Plans for Use of the Japonais Design

Tuccillo has not yet opened a restaurant using the name "Japonais"; indeed, it is undisputed that Tuccillo has never used the name "Japonais" or the Japonais design in connection with the provision of restaurant and lounge services.  (Pl.'s 56.1 ¶ 21; Def.'s 56.1 ¶ 26.)  It is further undisputed, however, that Tuccillo "has a firm intent" to do so.  (Pl.'s 56.1 ¶ 24; Def.'s 56.1 ¶ 24.)  Yet the extent of Tuccillo's preparations is in some dispute.  In his deposition, Tuccillo testified that he has "played around with the menu" for his planned restaurant and lounge, and that he intends to offer traditional Japanese food as well as "infused-style dishes."  (Tuccillo Dep., at 62.)  He further identified an exhibit depicting a "design layout" that he had created in 2002 for the space he had purchased in Baldwin, but had leased for other use in 2003.  (*Id.* at 64.)  Since leasing that property, he has been "aggressively pursuing" and "very aggressively looking" for other suitable

properties, and testified that he is "in the process of finding a location." (*Id.* at 69.) He confirmed that the purpose of this search was to "open up a restaurant/lounge under the name Japonais." (*Id.* at 70.) He explained that he has been looking in areas in and around New York City including Manhattan and Long Island. (*Id.* at 69.) He testified that he is not using a real estate agent, but has "viewed plenty of properties" and has in fact found "suitable locations." (*Id.* at 70.) When pressed for details, Tuccillo stated, "[s]pecific locations I can't give you," but ultimately testified that he was "continually looking in Manhattan," particularly in the meatpacking district in Manhattan's lower west side.[9] (*Id.* at 69, 71.) When asked directly if he had found a property, however, Tuccillo answered, "Well, we have some properties in mind." (*Id.* at 82.) Tuccillo has not explained his use of the word "we."

Relying on these portions of Tuccillo's deposition testimony, Geisha asserts that Tuccillo has "made substantial and meaningful preparations" to use the Japonais name and design in connection with "a Japanese-French style restaurant and lounge in or around New York City." (Pl.'s 56.1 ¶ 24.) Tuccillo cites to precisely the same material in denying having made "substantial and meaningful preparations." (Def.'s 56.1 ¶ 24.)

The court declines to adopt either of these characterizations. Regardless of which of them is more accurate, it is undisputed that Tuccillo has refused to abandon his ITU Application for the Japonais design. (Pl.'s 56.1 ¶ 23.) Indeed, shortly after briefing on Geisha's summary judgment motion was complete, Tuccillo on April 10, 2006 filed with the PTO the second of four requests—all granted—for a six-month extension of time to file a Statement of Use. (*Id.* ¶ 24; Def.'s 56.1 ¶ 24.) The request confirmed Tuccillo's "bona fide intention" to use the registered mark, and stated that

_____

[9] Although the parties' attorneys agreed during Tuccillo's deposition that his testimony concerning locations would be marked "confidential," (Tuccillo Dep., at 67-68), Tuccillo has not sought a protective order despite Geisha's citations to this testimony in its LR 56.1 statement and summary judgment briefs; and in any event, given that Tuccillo's testimony was non-specific as to the location of his planned restaurant, the court finds nothing in that testimony that warrants continued confidentiality.

his "ongoing efforts to use the mark" included "product or service research development" and "market research."[10]  (SOU Extension Request, Pl.'s Ex. 7, at Ex. A.)

Finally, Tuccillo testified in his deposition—which was taken before the opening of Geisha's New York Japonais—as to the possibility of Geisha's opening a restaurant in New York under that name.  When asked how he would handle potential customer confusion if both he and Geisha opened competing Japonais restaurants in New York, Tuccillo answered, "It [sic] won't be another restaurant with that name.  There will only be one.  And throughout the whole United States, too."  (Tuccillo Dep., at 75.)  When asked why he believed Geisha would not open a New York Japonais, Tuccillo baldly asserted that "if I have a restaurant in New York under the name Japonais, there won't be another one."  (*Id.* at 79.)

## D.    This Lawsuit and Geisha's Request for a Declaratory Judgment

Geisha brings ten claims against Tuccillo, alleging trademark infringement and false designation of origin under 15 U.S.C. § 1125(a) (Count I), common law misappropriation (Counts III and IV), conversion (Count V), violation of the Illinois Deceptive Trade Practices Act (Count VI), unfair competition (Count VII), interference with prospective business relations and contractual relationships (Counts VIII and IX), and unjust enrichment (Count X).  Count II of Geisha's complaint seeks a declaratory judgment that Tuccillo's "intended use of the Japonais design would constitute infringement of [Geisha's] national rights in that mark under Section 1125(a)."  (Compl. ¶ 48.)

Geisha has moved for summary judgment only as to Count II.  Elaborating on its prayer for relief in the Complaint, Geisha seeks a declaration that "Geisha's rights in the Japonais Design are

---

[10]    The PTO granted Tuccillo's fourth request for an extension on August 13, 2007. TARR Status for Serial No. 76599761, http://www.uspto.gov/main/trademarks.htm (search performed).  The court notes that because the time period during which an applicant must file a Statement of Use may not extend beyond 36 months from the issuance of a notice of allowance, *see* 37 C.F.R. § 2.89(e)(1), Tuccillo must file that statement, verifying that he is using the mark in connection with restaurant and lounge services, before August 23, 2008; a failure to do so would "result in the abandonment of [Tuccillo's] application."  *See* 37 C.F.R. § 2.88(h).

superior to those of Tuccillo and that Tuccillo's intended use of the Japonais Design in connection with the provision of restaurant and lounge services would constitute infringement of Geisha's exclusive rights in the Japonais Design." (Memorandum in Support of Geisha's Motion for Summary Judgment ("Pl.'s Mem."), at 15.) Tuccillo argues that a declaratory judgment would be improper: because he has not yet used the Japonais design in connection with a restaurant or lounge, Tuccillo maintains that there exists no "real or immediate controversy" to support declaratory judgment jurisdiction, and urges that Geisha is merely asking the court to render an advisory opinion with respect to the parties' trademark rights. (Tuccillo's Response to Geisha's Motion for Summary Judgment ("Def.'s Resp."), at 1-2.) Tuccillo further argues that Geisha has failed to establish nationwide rights in the Japonais design in any event. (*Id.* at 7.) The court addresses the issues raised by these arguments below.

## DISCUSSION

### I.     Availability of Declaratory Judgment

The Declaratory Judgment Act authorizes a federal court, "[i]n a case of actual controversy within its jurisdiction," to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201. Because the Act is not in itself a source of federal subject matter jurisdiction, the court must possess an independent basis for jurisdiction.[11] *See GNB Battery Techs., Inc. v. Gould, Inc.*, 65 F.3d 615, 619 (7th Cir. 1995) (citing *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950)). Where such a basis exists, "[t]he sole requirement for

---

[11]     Here, Geisha invokes federal question jurisdiction, 28 U.S.C. § 1331, pursuant to the Lanham Act, 15 U.S.C. § 1121, as well jurisdiction-enabling statutes relating to trademarks and unfair competition. 28 U.S.C. § 1338(a) & (b). These jurisdictional bases are evident from the Complaint, which indeed states claims under the Lanham Act (Count I) and for unfair competition in association with a trademark claim (Count VII). As discussed at the conclusion of this opinion, however, the evidence calls into question the viability of Geisha's trademark infringement claim, which in turn has implications for the court's continued jurisdiction over this action. As Geisha has not identified its members, it has not established that the parties are diverse in citizenship. *See Cosgrove v. Bartolotta*, 150 F.3d 729, 731 (7th Cir. 1998) ("the citizenship of an LLC for purposes of the diversity jurisdiction is the citizenship of its members.").

jurisdiction under the Act is that the conflict be real and immediate, i.e., that there be a true, actual 'controversy' required by the Act.'" *Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 96 (1993) (quoting *Arrowhead Industrial Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 734-35 (Fed. Cir. 1988) (citations omitted)). This "actual controversy" requirement is equivalent to Article III's case-or-controversy requirement, *see MedImmune, Inc. v. Genentech, Inc.*, 127 S. Ct. 764, 771 (2007), and thus incorporates Article III doctrines of ripeness and standing. *See Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.*, 482 F.3d 1330, 1336-38 (Fed. Cir. 2007). The party seeking a declaratory judgment in federal district court bears the burden of establishing the existence of an actual controversy. *Cardinal Chem.*, 508 U.S. at 95 (citing *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937)). Even if declaratory judgment jurisdiction is thereby established, courts have discretion to decline to exercise that jurisdiction. *Tempco Elec. Heater Corp. v. Omega Eng'g, Inc.*, 819 F.2d 746, 747 (7th Cir. 1987).

### A.      Standard for Determining "Actual Controversy"

As a preliminary matter, the court must ascertain the correct legal standard for determining whether the present controversy is "real and immediate," thus satisfying the "actual controversy" requirement for jurisdiction under the Declaratory Judgment Act. As Geisha points out, in declaratory judgment actions relating to trademarks, the Seventh Circuit has looked to patent infringement cases for the requirements for establishing an actual controversy. *See, e.g., G. Heileman Brewing Co. v. Anheuser-Busch, Inc.,* 873 F.2d 985, 990 (7th Cir. 1989). The court follows a similar course here, and thus takes particular note of Federal Circuit authority. In a typical declaratory judgment action in the patent context, a potential infringer sues a patentee, seeking a declaration of noninfringement, invalidity of the patent, or both. *Lang v. Pacific Marine and Supply Co., Ltd.*, 895 F.2d 761, 763 (Fed. Cir. 1990); *see, e.g., Microchip Tech. Inc. v. Chamberlain Group, Inc.*, 441 F.3d 936, 939 (Fed. Cir. 2006). Until quite recently, the Federal Circuit articulated a two-part test for determining the existence of an "actual controversy" in such cases: the declaratory

plaintiff (i.e., the potential infringer) must establish both "(1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such an activity." *Teva Pharms.*, 482 F.3d at 1339; *see Microchip Tech.*, 441 F.3d 936 at 942; *see also G. Heileman Brewing Co.*, 873 F.2d at 990 (adopting similar "reasonable apprehension of suit" standard in trademark case). Tuccillo relies heavily on this test, noting that he has never threatened Geisha with suit. (Def.'s Resp., at 2-3.)

The "reasonable apprehension of suit" test, *see SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1380 (Fed. Cir. 2007), however, is inapplicable here for two reasons. First, as Geisha points out, this case reverses the roles of the parties in a typical, "defensive" declaratory judgment action because the putative owner of the intellectual property (Geisha) is acting "offensively" by suing a potential future infringer (Tuccillo). More significantly, though neither party appears to have noticed, the Federal Circuit has now discarded the test altogether in the wake of the Supreme Court's *MedImmune* decision, which explicitly addressed the question of what constitutes an "actual controversy" for purposes of the Declaratory Judgment Act.[12] *See SanDisk*, 480 F.3d at 1380 ("The Supreme Court's opinion in *MedImmune* represents a rejection of our reasonable apprehension of suit test"); *Teva Pharms.*, 482 F.3d at 1339 (holding that *MedImmune* "overruled" the Federal Circuit's reasonable-apprehension-of-suit test for determining the existence of an "actual controversy").

The declaratory judgment plaintiff in *MedImmune*, a drug manufacturer, had entered into a licensing agreement in which it agreed to pay royalties to defendant Genentech on sales of products covered by Genentech's two patents, one of which was pending at the time of the agreement. 127 S. Ct. at 768. After the pending application issued as the "Cabilly II" patent,

---

[12]     *MedImmune* was decided after briefing on the instant motion was complete.

Genentech delivered a letter to plaintiff MedImmune, expressing its belief that MedImmune's drug Synagis, from which MedImmune derived most of its revenue, was covered by Cabilly II and that royalties were thus due. *Id.* MedImmune construed the letter as a threat to terminate the license agreement and sue for patent infringement if MedImmune did not pay the requested royalties. *Id.* MedImmune paid the royalties under a reservation of its rights, and filed a declaratory judgment action that sought, *inter alia*, a declaration that Synagis did not infringe and that the Cabilly II patent was invalid. *Id.* at 768-69. The district court dismissed for lack of subject matter jurisdiction, holding that MedImmune, as a licensee in good standing, could have no reasonable apprehension of suit as long as it continued to pay royalties; the Federal Circuit affirmed. *Id.* at 768.

The Supreme Court reversed. Noting that the actual controversy requirement would have easily been satisfied had MedImmune broken the licensing agreement by refusing to pay royalties, *id* at 771-72, the Court held that MedImmune was not required to do so in order to seek a declaratory judgment that the underlying patent was invalid or not infringed. *Id.* at 777. The Court explained that the phrase "actual controversy" in the Declaratory Judgment Act "refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III." *Id.* at 771. Thus, for a court to have jurisdiction over a declaratory judgment action, what is required is that "the dispute be 'definite and concrete, touching the legal relations of parties having adverse legal interests'; and that it be 'real and substantial' and 'admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" *Id.* at 771 (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937)). In other words, "'the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Id.* (quoting *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). The Court admitted, however, that these standards "do not draw the brightest of lines between those declaratory-judgment actions that

satisfy [Article III's] case-or-controversy requirement and those that do not." *Id.*

In a footnote, the Court noted that the Federal Circuit's reasonable-apprehension-of-suit test conflicted with the Court's precedent; the Court cited non-patent cases in which declaratory judgment jurisdiction obtained even though the plaintiffs either had no indication that the defendant would file suit, or the defendant could not have sued the plaintiff at all. *Id.* at 774 n.11 (citing *Maryland Cas. Co.*, 312 U.S. at 273 & *Aetna Life Ins.*, 300 U.S. at 239.) As noted above, the Federal Circuit, relying on this footnote and the holding of *MedImmune*, has since concluded that the decision "eliminated" the test altogether. *See Honeywell Int'l. Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 995 (Fed. Cir. 2007). Indeed, post-*MedImmune*, it is "clear that a declaratory judgment plaintiff does not need to establish a reasonable apprehension of a lawsuit in order to establish that there is an actual controversy between the parties." *Sony Elecs., Inc. v. Guardian Media Techs., Ltd.*, ___ F.3d ___, 2007 WL 2215762, at *11 (Fed. Cir. Aug. 3, 2007).

The above developments in the case law render Tuccillo's proposed legal standard incorrect, and likewise moot any argument based on his assertion that he never threatened Geisha with a lawsuit. Geisha's proposed test for determining the existence of an "actual controversy" fares no better, however. As noted, this case presents the converse of the typical declaratory action in which a potential infringer seeks a declaration that the underlying patent (or trademark) is invalid and/or that the plaintiff's current or planned future activities do not infringe; here, Geisha seeks a declaration of its trademark rights in the Japonais design as opposed to Tuccillo's rights, and a declaration that Tuccillo's planned restaurant would infringe on those rights. In *Lang*, upon which Geisha relies for its proposed legal standard, the Federal Circuit addressed this type of situation and modified the reasonable-apprehension-of-suit test to fit the reversed circumstances. The defendant in *Lang* was in the process of manufacturing a ship's hull that the plaintiff contended would infringe its patent when finished. 895 F.2d at 763. Considering the plaintiff's request for a declaratory judgment, the court recognized that declarations of infringement sought by patentees

against alleged future infringers are atypical. Nonetheless, as long as there are sufficient allegations of "immediacy and reality," the court found "no reason why a patentee should be unable to seek a declaration of infringement against a future infringer when a future infringer is able to maintain a declaratory judgment action for noninfringement under the same circumstances." *Id.* at 764.

The *Lang* court articulated the following two-part reasonable-apprehension test, which Geisha proposes as the legal standard applicable here: "(1) the defendant must be engaged in an activity directed toward making, selling, or using subject to an infringement charge . . ., or be making meaningful preparation for such activity; and (2) acts of the defendant must indicate a refusal to change the course of its actions in the face of acts by the patentee sufficient to create a reasonable apprehension that a suit will be forthcoming." *Id.* The court explained that the first prong of this test, which looks to the potential infringer's conduct, is "identical" to the second prong of the test used in the typical situation where the potential infringer is the plaintiff. *Id.* The second prong, according to the court, "is similar to the reasonable apprehension prong in the normal action." *Id.* Having formulated this test, however, the court did not explicitly apply it; rather, the court simply found that because the defendant's hull would not be complete until nine months after the complaint was filed, and given that the defendant had "engaged in [no] activity indicating that the ship would soon be ready for sea," there was "no substantial controversy . . . of sufficient immediacy and reality to warrant consideration of [the plaintiff's] claim for declaratory relief." *Id.* at 764-65.

Given the close similarity between the two-part test articulated in *Lang* and the traditional reasonable-apprehension-of-suit test that has been abandoned after *MedImmune*, the court concludes that the *Lang* test likewise is no longer good law.[13] The court thus disregards the parties'

---

[13] The court further notes that the wording of the second prong of the *Lang* test—the defendant's "refusal to change the course of its actions in the face of acts by the patentee sufficient

proposed legal standards for determining whether an "actual controversy" exists in this case to provide the court with jurisdiction over Geisha's request for declaratory relief, and adopts the standard as articulated in *MedImmune* and subsequent Federal Circuit decisions in patent cases.[14] The ultimate test is whether, "under all the circumstances," a "definite and concrete" controversy exists between parties having adverse legal interests; the controversy must be of sufficient "immediacy and reality to warrant the issuance of a declaratory judgment," such that a declaration would not simply amount to "an opinion advising what the law would be upon a hypothetical state of facts." *MedImmune*, 127 S. Ct. at 771 (citations omitted); *see Teva Pharms.*, 482 F.3d at 1338 ("a declaratory judgment plaintiff is only required to satisfy Article III, which includes standing and ripeness, by showing under 'all the circumstances' an actual or imminent injury caused by the defendant that can be redressed by judicial relief and that is of 'sufficient immediacy and reality.'") (quoting *MedImmune*, 127 S. Ct. at 771). The party claiming declaratory judgment jurisdiction must establish that an actual controversy existed at the time of the filing of the complaint. *See Benitec Australia, Ltd. v. Nucleonics, Inc.*, ___ F.3d ___, 2007 WL 2069646, at *3 (Fed. Cir. July 20, 2007).

### B. No "Actual Controversy" Is Present in This Case

Geisha argues that a "real and immediate" controversy exists and is ripe for adjudication because Tuccillo's expressed intention to open a restaurant, under the name "Japonais" and using the Japonais design, and his preparations in this regard, constitute "activity directed towards infringing Geisha's rights in the Japonais design." (Pl.'s Mem., at 8 (citation omitted).) Tuccillo maintains that there is no actionable controversy here. He notes that he has no trademark rights

---

to create a reasonable apprehension that a suit will be forthcoming"—is somewhat confusing in that it is unclear, from this language, from which party a suit would be forthcoming and which party would thus need to have a "reasonable apprehension" of suit.

[14]     The Seventh Circuit has yet to address the impact of *MedImmune*, and, as noted, has looked to patent decisions in ascertaining standards for declaratory judgment actions in trademark cases. The court is thus comfortable in looking to Federal Circuit decisions for the appropriate legal standard.

in the Japonais design because he has not yet used the mark in connection with restaurant and lounge services, and that he therefore would be unable to maintain a cause of action against Geisha; according to Tuccillo, his own inability to bring a cause of action precludes the existence of an "actual controversy." (Def.'s Resp., at 3-5.) He further argues that his steps towards opening a restaurant, which he now characterizes as merely "driving around looking for a location," are insufficient to create a "real and immediate" controversy. (Tuccillo's Sur-Reply to Geisha's Motion for Summary Judgment, at 3.) The court finds the latter argument persuasive, and concludes, as explained below, that in light of the *MedImmune* standard and subsequent Federal Circuit case law, the present controversy indeed lacks sufficient "immediacy and reality." *See MedImmune*, 127 S. Ct. at 771.

As noted, *MedImmune* itself acknowledged that its articulated standard for determining the existence of an "actual controversy" does not amount to a bright-line rule. *See* 127 S. Ct. at 771. A handful of subsequent Federal Circuit cases, however, have begun to suggest the contours of declaratory judgment jurisdiction in patent cases—albeit only in the "typical" circumstance where a potential infringer seeks a declaration that the other party's patents are invalid and/or that its own products do not infringe. Of these decisions, the court finds *Benitec Australia* particularly relevant here. In that decision, the court concluded that sufficient immediacy and reality did not exist to support jurisdiction over the defendant's declaratory judgment counterclaim once the plaintiff had voluntarily dismissed its infringement claim. *Benitec Australia*, 2007 WL at *2, 6-7. Benitec sued Nucleonic for infringing Benitec's gene-therapy patent. *Id.* at *1. Nucleonic initially moved to dismiss on the basis that it was years away from introducing any infringing gene-therapy drug products, but eventually amended its answer to include a counterclaim seeking a declaration that the patent was invalid and unenforceable. *Id.* at *1-2. After Benitec dismissed its own complaint in light of an unfavorable Supreme Court decision, the district court dismissed Nucleonic's counterclaim for lack of jurisdiction. *Id.* at *2. Addressing the jurisdictional issue "strictly under the

16

framework of *MedImmune*," *id.* at *5, the Federal Circuit affirmed.[15]    The court discussed Nucleonic's allegedly infringing intentions separately with respect to its plans for human and animal gene-therapy drug treatment.   The parties agreed that Nucleonic's activities related to human treatment could not be considered infringing unless and until Nucleonic filed a new drug application ("NDA") with the Food and Drug Administration ("FDA").   *Id.* at *5.   Nucleonic did not anticipate filing an NDA, however, until "at least 2010-12, if ever," and its current activities consisted entirely of developing and submitting (unidentified) preliminary information to the FDA.   *Id.*   The court found no actual controversy in such circumstances: "The fact that Nucleonics may file an NDA in a few years does not provide the immediacy and reality required for a declaratory judgment."   *Id.* Similarly, Nucleonic's averred intent to expand into the area of animal treatment and veterinary care—which it asserted would not require an NDA for its products to be found infringing—was insufficient to support jurisdiction.   *Id.* at *7.   Nucleonic's activities in this regard consisted only of discussions with an unnamed potential customer, with whom Nucleonic had executed a confidentiality agreement.   *Id.*   In short, the court explained, Nucleonic's "vaguely defined potential expansion" to animal and veterinary products did not "meet the immediacy and reality requirement of *MedImmune* necessary to support a justiciable controversy."   *Id.* at *7-8.

The *Benitec Australia* court, like the court in *Lang*, discussed above, thus focused on whether the potential infringer's proposed future activities were definite enough, or had progressed sufficiently, to create a "real and immediate" threat of infringement.   Indeed, this court takes note of the holding in *Lang*, for although that decision is less persuasive in light of its use of the now-discredited "reasonable apprehension of suit" test, it did specifically address the reversed-role

---

[15]    There was no question that declaratory judgment jurisdiction existed at the time Nucleonic filed its counterclaim requesting such relief, given Benitec's pending infringement claim; because an "actual controversy" must continue even after jurisdiction is first invoked, however, the issue emerged after Benitec dismissed its complaint, leaving the counterclaim for declaratory relief standing alone.   *Benitec Australia*, 2007 WL at *3.

17

situation present in this case. *See* 895 F.2d at 764. Moreover, as noted, the court did not explicitly apply that test; indeed, the plaintiff's apprehension of a lawsuit did not factor into the court's analysis at all. Instead, as in *Benitec Australia* and consistent with the *MedImmune* standard, the *Lang* court found that the controversy lacked "sufficient immediacy and reality" because the allegedly infringing product—the ship's hull—was far from complete when the complaint was filed, and the defendant had not engaged in activity indicating that the ship would be "soon be ready for sea," which use would be required for any finding of infringement. *Id.* at 764-65.

Here, too, it does not appear that the event that would allegedly infringe Geisha's asserted trademark rights in the Japonais design—Tuccillo's opening of his own "Japonais" restaurant—was in any imminent danger of occurring when this action was filed. It is undisputed that Tuccillo has a "firm intent" to use the name "Japonais" and the Japonais design in connection with the provision of restaurant and lounge services, (Def.'s 56.1 ¶ 24); indeed, Tuccillo asserted his "bona fide intention" to do so when he filed his verified ITU Application with the PTO, and it is further undisputed that he has "refused to abandon" that application. (*Id.* ¶ 23.) Yet his actual preparations for opening a restaurant do not appear to have advanced significantly beyond this statement of intent. Pointing to selected statements in Tuccillo's deposition testimony, Geisha contends that he has "taken significant steps toward opening a restaurant." (Plaintiff's Reply Brief in Support of Its Motion for Summary Judgment, at 5.) In the court's view, however, Tuccillo's testimony reveals little in the way of significant activity. Essentially, Tuccillo's preparations for opening his own "Japonais" restaurant, according to his deposition testimony, have consisted entirely of "play[ing] around with" a menu and searching for a suitable location. The former is of little consequence; and the latter activity would carry more significance but for the fact that Tuccillo's search for a property does not appear either serious or advanced. As of the time of his deposition in January 2006, he had not found a location: he testified that he "do[es]n't have specific properties right now," (Tucillo Dep., at 69), and when asked directly if he had found a property, he

answered that he merely "ha[s] some properties in mind." (*Id.* at 82.)  He was not using a real estate agent, and when asked to explain what he meant by "aggressively pursuing" a location, he answered, "I am out myself driving around and doing my due diligence." (*Id.* at 69.)  Even his testimony that he was searching in Manhattan's meatpacking district is offset by the fact that he also testified to looking in other areas near the city, including Nassau County and elsewhere on Long Island. (*Id.* at 69.)  Nor does the record reveal whether Tuccillo has ever opened a restaurant before, or indeed whether he has any food service experience beyond his frozen seafood business.

Moreover, in addition to lacking in specifics, Tuccillo's testimony fails to establish the necessary time frame.  As noted, Geisha must show an actual, "real and immediate" controversy as of the time Geisha filed its complaint requesting declaratory relief—September 26, 2005.  *See Benitec Australia*, 2007 WL 2069646, at *3.  Tuccillo's deposition was taken in January 2006.  Although he testified that he has been searching for a suitable property "since 2002," (Tuccillo Dep., at 69), there is no indication in his testimony as to which aspects of that search took place prior to September 2005.  Tuccillo does assert that he purchased a Chinese restaurant in 2002 with the intention of converting it into a Japanese-style restaurant, and even created a "design layout"; but the fact that he decided instead to lease out the space in 2003 suggests that he in fact abandoned that plan long before September 2005.  Similarly, Geisha's citation to Tuccillo's April 10, 2006 request for an extension of time to file a Statement of Use with the PTO is irrelevant to a determination of whether an actual controversy existed when Geisha filed its complaint.

Tuccillo's activities thus appear akin to those of the counterclaiming defendant in *Benitec Australia*, and the plaintiff in *Lang*.  The allegedly infringing activity in this case—Tuccillo's opening of a restaurant using the name "Japonais" and the Japonais design—was far from imminent when this action was filed, and may never happen at all, given the subsequent opening and success of Geisha's New York Japonais.  The evidence shows merely Tuccillo's stated intent to open a restaurant—like Nucleonic's avowed intent to expand into animal treatment in *Benitec*

*Australia*—and some preliminary steps that Tuccillo has taken, lacking much in the way of specific details that might indicate concrete action. Similar to Nucleonic's contract discussions with a potential customer, Tuccillo's description of his search for a suitable location for his restaurant suggests a mere and distant possibility of potentially infringing activity, rather than a real, immediate, or imminent threat.

The case upon which Geisha relies, *Glaxo Group Ltd. v. Apotex, Inc.*, 130 F. Supp. 2d 1006 (N.D. Ill. 2001), does not require a contrary conclusion. There, Glaxo marketed and sold an antibiotic, Ceftin, which was covered by a patent that Glaxo owned but which was set to expire in 2003. *Id.* at 1007. In 2000, Apotex, a Canadian generic drug manufacturer, filed an abbreviated new drug application ("ANDA") with the FDA for permission to market a generic version of Ceftin. *Id.* Both parties predicted that the FDA would approve the ANDA before expiration of Glaxo's patent. *Id.* Following Apotex's filing of the ANDA, Glaxo wrote several letters to Apotex, requesting information regarding Apotex's plans for marketing generic Ceftin in the United States. *Id.* at 1008. Receiving no response, Glaxo filed a lawsuit seeking a declaratory judgment that Apotex's "threatened acts of manufacture, importation and sale of products covered by [Glaxo's] patent" would infringe that patent, and an injunction preventing Apotex from selling generic Ceftin until after the patent expired. *Id.* Apotex moved to dismiss for lack of a justiciable controversy, arguing that the allegations did not establish that it had "decided whether and when to market" the allegedly infringing generic drug. *Id.*

The district court, finding a sufficient "actual controversy," denied the motion. The court found that Apotex's filing of the ANDA, coupled with its refusal to respond to Glaxo's letters and the "enormous amount of money at stake"—yearly sales of Ceftin exceeded $600 million—led to "the inescapable conclusion" that Apotex planned to enter the market "as soon as possible." *Id.* at 1008-

09.[16]  Here, Geisha attempts to draw an analogy between Apotex's ANDA and Tuccillo's ITU Application: because the court in *Glaxo* found that the ANDA represented "meaningful preparations to be ready to market the allegedly infringing product," *id.* at 1008, the ITU Application establishes, according to Geisha, that Tuccillo has engaged in "meaningful preparation directed towards using the Japonais design."  (Pl.'s Mem., at 7.)

The court finds that analogy unpersuasive, and *Glaxo* distinguishable from the present circumstances in several respects.  First, the parties in that case *agreed* that Apotex's filing of the ANDA "means that [Apotex] is ready or has at least made meaningful preparations" for selling its allegedly infringing generic drug.  *Glaxo*, 130 F. Supp. 2d at 1008.  Here, of course, Tuccillo explicitly denies that the ITU Application or any of his activities amount to "substantial and meaningful preparations," (Def.'s 56.1 ¶ 24), and, as explained above, Tuccillo does not appear to have taken significant steps towards opening a New York Japonais restaurant in any event.  Second, the controversy was imminent in *Glaxo* because Apotex itself acknowledged that the FDA would likely approve the ANDA before the expiration of Glaxo's patent, thus clearing the way for Apotex to market infringing products.  Tuccillo's activities do not similarly suggest that his restaurant is likely to open in the near future.  Third, given the circumstances in *Glaxo*—a top-selling drug worth hundreds of millions of dollars, an expiring patent, and a generic drug manufacturer who had filed an application for approval to sell a generic version, it was indeed "obvious" in that case that the defendant planned to enter the United States market with a potentially infringing product.  130 F. Supp. 2d at 1009.  In contrast, given that Tuccillo, who has never opened any restaurant, has taken few concrete steps towards opening his "Japonais" restaurant, it is not at all obvious that potentially infringing activity will occur in this case.

The court further notes that other post-*MedImmune* Federal Circuit decisions have found

---

[16]  The court in *Glaxo* utilized the now-obsolete two-part *Lang* test, but did not find Glaxo's reasonable apprehension of suit to be a significant factor.

declaratory judgment jurisdiction proper by emphasizing the fact that the parties had explicitly articulated their positions with respect to infringement and validity; thus, the controversies had crystallized to the point where any further delay in adjudication of the dispute would be unnecessary.  In *SanDisk*, for example, the parties had engaged in cross-licensing negotiations, during which each party presented extensive detailed analyses of the ways in which the other's products infringed its own patents.  480 F.3d at 1374-75.  The court vacated the district court's dismissal of the plaintiff's request for declaratory relief, which dismissal had been based on the now-irrelevant fact that the defendant had explicitly represented that it would not file an infringement suit.  *Id.* at 1376, 1383.  Explaining that declaratory judgment jurisdiction depends on "the facts and circumstances of each case," *id.* at 1381, the court found it sufficient that the defendant "had made a studied and determined infringement determination and asserted the right to a royalty based on this determination[,]" and that the plaintiff had explicitly "maintained that it could proceed in its conduct without the payment of royalties" to the defendant.  *Id.* at 1382; *see also Sony Elecs.*, 2007 WL 2215762, at *12-15 (declaratory judgment jurisdiction proper where plaintiffs, potential infringers, and defendant patent owner "had taken adverse positions" prior to filing of suit as to whether patents were invalid and whether plaintiffs' products infringed; parties had sufficiently identified the basis for their positions so that the controversy was "definite and concrete").

In the case before this court, the parties' articulation of their respective positions with regard to trademark rights and potential infringement was less specific.  Long's September 9, 2005 letter to Tuccillo's trademark attorney, Bellus, asserted Geisha's rights in the Japonais design through "actual use" in connection with the Chicago restaurant; significantly, Long did not assert that those trademark rights extended nationwide, but merely stated that the restaurant had received "nationwide publicity."  (Pl.'s Ex. 5, at Ex. A.)  Bellus's response asserted that when the PTO issued a registration of the mark from Tuccillo's application, Tuccillo would have "nationwide rights," except in those areas where Geisha "can establish rights that predate [Tuccillo's] filing date."  (Pl.'s Ex. 5,

at Ex. B.)  In the court's view, this represents more of a preliminary exchange of initial positions rather than the explicit analyses of patent validity and infringing products that the *SanDisk* court found sufficient to create a definite and concrete controversy.  In any event, there was no question in *SanDisk* that the possibility of infringement was "real and immediate," for the plaintiff was already producing products that the defendant believed were infringing; rather, the parties' dispute centered on whether the plaintiff should pay royalties.  480 F.3d at 1375-76.

In light of the court's conclusion that Tuccillo's allegedly infringing future activity lacks sufficient immediacy and reality, the court need not address his argument that no controversy exists because he would be unable to sue Geisha until he actually uses the trademark.  The court notes, however, that it is unclear whether the fact that Tuccillo was not using the mark would, in itself, defeat declaratory judgment jurisdiction.  Although Tuccillo is correct that "no rights are conferred by the mere filing of a federal trademark application," *see S Indus., Inc. v. Diamond Multimedia Sys., Inc.*, 991 F. Supp. 1012, 1019 (N.D. Ill. 1998), Tuccillo cites no authority for the further proposition that his inability to assert enforceable trademark rights in a suit against Geisha would necessarily preclude *Geisha* from invoking declaratory judgment jurisdiction in a suit against *him*.  The court in *Benitec Australia* did identify a defendant's ability to maintain a cause of action against a declaratory judgment plaintiff as a "useful question to ask in determining whether an actual controversy exists[,]" 2007 WL 2069646, at *3, but that factor did not enter the court's analysis.  Moreover, *MedImmune* suggests a rejection of Tuccillo's proposed rule, for the Court noted that it had previously exercised jurisdiction "even though the declaratory-judgment defendant could not have sued the declaratory-judgment plaintiff[] . . . ."  127 S. Ct. at 774 n.11 (citing *Maryland Cas. Co.*, 312 U.S. at 273).

In sum, no "actual controversy" exists in this case to support the exercise of jurisdiction under the Declaratory Judgment Act.  The court thus declines to reach the merits of Geisha's motion for summary judgment, which seeks a declaration that Tuccillo's potential opening of a

restaurant using the Japonais name and design would infringe Geisha's trademark rights in the Japonais design as a matter of law. Because Tuccillo's allegedly infringing activity lacks "sufficient immediacy and reality," any such declaration would amount to little more than an improper "opinion advising what the law would be upon a hypothetical state of facts." *Id.* at 771 (citations omitted). Geisha's request for declaratory relief must thus be dismissed for lack of subject matter jurisdiction. *See* FED. R. CIV. P. 12(h)(3).

## CONCLUSION

For the foregoing reasons, Geisha's motion for summary judgment (26) is denied, and Count II of the Complaint is dismissed without prejudice. In light of the evidence demonstrating that Tuccillo has apparently not yet engaged in any infringing activity, Geisha's claim of trademark infringement (Count I), which serves as the basis for the court's jurisdiction, is of dubious viability. Accordingly, the court will entertain a motion for summary judgment as to Count I. If that motion results in dismissal of Geisha's infringement claim, the court, absent an amended complaint that establishes diversity jurisdiction, will dismiss the remaining claims without prejudice to re-filing in an appropriate state court.

ENTER:

Dated: September 4, 2007

_____

REBECCA R. PALLMEYER
United States District Judge